# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs July 23, 2013

## STATE OF TENNESSEE v. DONALD WEST ALLEN, JR.

**Appeal from the Criminal Court for Cumberland County**
**No. 11-0085     Leon Burns, Jr., Judge**

**No. E2012-01773-CCA-R3-CD - Filed September 18, 2013**

Donald West Allen, Jr. ("the Defendant") was charged with three counts of rape of a child, and a jury convicted the Defendant of three counts of aggravated sexual battery. After a sentencing hearing, the trial court sentenced the Defendant to nine years on each count, with the sentences for counts one and two to run consecutively and the sentence for count three to run concurrently, for an effective term of eighteen years' incarceration, to be served at 100%. In this direct appeal, the Defendant raises four issues: (1) the trial court erred in allowing the State to reference uncharged conduct during its opening statement and then to adduce testimony about the uncharged conduct during trial; (2) the evidence is not sufficient to support his convictions; (3) the trial court erred in singling out a juror for questioning after the close of proof; and (4) his sentence is excessive. Upon our thorough review of the record and applicable law, we discern no reversible error. Accordingly, we affirm the trial court's judgments.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments
## of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Jeffrey A. Vires (on appeal and at trial) and James P. Smith, Jr. (at trial), Crossville, Tennessee, for the appellant, Donald West Allen, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Randall A. York, District Attorney General; Gary McKenzie, Deputy District Attorney General; and Amanda M. Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

The Defendant was charged with three counts of rape of a child, each crime alleged to have occurred "on a specific day between July 1, 2009, to December 1, 2009," and each count alleged to have been committed by sexual penetration of the victim by the Defendant. Although the record contains references to the Defendant's motion for a bill of particulars, to which the State apparently responded, the record contains neither the Defendant's motion nor the State's response. At the Defendant's jury trial, the following proof was adduced:

The victim's mother ("Mother") testified that the victim was born on July 3, 2001. Although the Defendant is the victim's father, Mother and the Defendant were no longer a couple at the time of the victim's birth. The Defendant entered the victim's life at about the time she turned two years old. Mother and the Defendant rekindled their relationship, resulting in the birth of the victim's sister ("Sister"). Shortly after Mother learned she was pregnant with Sister, her relationship with the Defendant ended. Sister was born on April 6, 2004. Mother did not list the Defendant on either of the birth certificates.

In 2007, the Defendant reappeared in Mother's life. Mother testified that the Defendant contacted her because "[h]e wanted to be back in his kids' life." Mother agreed to let the Defendant see the children at Mother's father's house. After several of these supervised visits, Mother allowed the Defendant to take the girls home with him on occasion. During the fall of 2007, she allowed the Defendant to take the girls home on three weekends out of the month. This practice continued for about eighteen months, until the Defendant was deployed. After his deployment, the Defendant continued to communicate with the victim over the phone and by e-mail.

Mother reviewed a collection of ten text messages and e-mails that the Defendant sent the victim beginning in May 2010. The Defendant was in Iraq at this time. In April 2010, the Defendant had been home on leave, and the victim had visited him. Mother testified that, after her visit with the Defendant while he was home on leave, the victim's attitude toward the Defendant changed. Mother testified that the victim "didn't want to have no [sic] conversations with him." Nevertheless, the Defendant continued to send text messages to the victim "every day." Mother was reviewing the text messages as the Defendant was sending them. Mother stated that the Defendant repeatedly asked the victim, "Why won't you talk to me?" and asked her to send pictures and talk to him. Even when the Defendant called Mother and asked Mother to have the victim speak with him, the victim "wouldn't want to."

The collection of ten communications from the Defendant to the victim was admitted as an exhibit. In the e-mail dated May 23, 2010, the Defendant stated that he did not understand why the victim was mad at him and would not talk to him. He explained that his duty in Iraq was almost finished, that he would be home soon, and that he would not leave again after he returned. The Defendant wrote, "I never meant to hurt you in any way. I love you with all my heart. I hope you know that. I have never been mad at you. And you are the light of my life." He stated that his deployment was the hardest thing he had ever done because it caused him to be away from the victim. He wrote, "Whatever I have done to upset you, you can tell me. You have always been able to tell me everything. And that will never change. If I have done something you need to tell me so it never happens again. If someone else has done something you need to tell me so I can fix it."

On May 28, 2010, the Defendant sent an e-mail to the victim that caused Mother to become concerned. The May 28 e-mail contains the following:

I have put my heart in your hands. I just want to get home to you. What has been will be there is nothing we can do about it. I just want to hold you now [victim's name]. The crazy skies are above us now. The wind is beating on at our faces. And everything I held so dear has disappeared without a trace. For all the time I tasted love. I never knew what I had. Little darling, if your [sic] reading this now I have never needed you so bad. You're always spinning around in my head. My heart rest [sic] in your hands. Everything that has happened is in the past. I have been talking gibberish. Trying to make since [sic] of these crazy people here. Falling in and out of sleep. I am just trying to get an explanation here. Why it's taken so long for you to speak. I can't wait to hold you. When I get home, were [sic] just going to get away together. My heart is so much in your hands, don't put me down, it will brake [sic] me up.

It's Friday night and I am going nowhere. All the lights are going off. Turning on the TV, and you keep running throw [sic] my head. I look back at everything that has, happened and I am a fool. I wish that you where [sic] with me. I have been so afraid. I wish we where [sic] together so I could show you how I feel. I miss not being with you. Please don't let go of my heart. I am losing my head over this. I am always thinking of you. Wondering where you're headed to. All I think about is you. What on earth is going on in your heart? It seems like you have turned cold as stone. You have cut me down to the bone. I miss you and need you to talk to me.

. . . .

-3-

I feel like all I do is stand in the dark and cry about missing you. I am going to make sure this doesn't happen again. This has to be the biggest mistake I have ever mad. [sic] (Leaving you) I can't take my mind off you. I belong to you. Take a look at a picture of me. You know me. Call me and say hello, some time. I can't wait to say hello to you. I won't be saying good bye for a long long time. I feel like my life is such a mess without you. I have done so much wrong in my life. And I never realized how much I needed you. This is one thing that has been the hardest, because you're not talking to me. I miss you. I look up at the deep dark sky. And I wonder sometime if you're looking up at the same time. I can't wait to get home and get back to our steady life.

Mother stated that this letter was "not a way that you would talk to your daughter." Mother described the letter as, rather, "a love letter like to a girlfriend, or somebody you wanted to be in a relationship with."

On June 1, 2010, Mother's sister ("Aunt") sent Mother a text about the victim. In response, Mother contacted the sheriff.

Mother acknowledged that, on March 24, 2010, she sent the Defendant several messages objecting to his calling the girls by his last name instead of their own. On May 21, 2010, the Defendant sent her the following text message: "The only thing I am up to and you already know is I am looking into getting their name changed. Its what [the victim] wants. Stop hating me so much your [sic] just hurting the girls."

On cross-examination, Mother acknowledged that much of the text of the Defendant's May 28, 2010, e-mail correspondence matched the lyrics of three songs by David Gray. She also acknowledged telling the Defendant, in response to his concerns about the girls not wanting to talk to him, that he could not "expect kids to sit around and wait for the phone to ring or wait to get a text message. They're kids. They want to go outside and play." Mother acknowledged that, from June 2009 to December 2009, the victim made no complaints to her about pain or about seeing the Defendant.

On re-direct examination, Mother characterized the song lyrics as "love songs."

Beverly Cotton, a pediatric nurse practitioner, testified that she performed a forensic pediatric examination on the victim on March 8, 2011. She testified that the victim's exam was "normal." She stated that she was not surprised by this result because the relevant research demonstrated that "most children who disclose sexual abuse or genital penetration will have normal exams." She added that the victim did not report any bleeding.

On cross-examination, Cotton admitted that she has no way of knowing whether the claims of abuse reported by a child and/or her caregiver are true. She admitted that Mother provided the victim's history and stated that she (Mother) first learned of the allegations of sexual abuse from the victim in April 2010.

On re-direct examination, Cotton testified that there is "usually significant injury if there's full vaginal penetration of a prepubescent child," including bleeding.

Aunt testified that, on June 1, 2010, she and the victim were driving to a ball game, and she noticed that the victim "wasn't acting herself." When Aunt inquired what was wrong, the victim began "to tear up and stuff." Eventually, the victim related what had happened, and Aunt texted Mother about what the victim had said. Aunt and the victim continued to the ball game.

The victim, ten years old at the time of trial, testified that she visited the Defendant, her father, while she was eight years old. During the time after she turned eight on July 3, 2009, and before the Defendant left for Iraq, she spent most of her weekends at the Defendant's house, where he lived with his mother and his brother. The victim testified that, while she was staying with the Defendant, he would check her for ticks by looking at her "everywhere." This would occur while she was lying down on the Defendant's bed with her clothes off. The Defendant touched her "privates" with his hands. She stated that the Defendant called her private area "[p]ussy."

The victim testified that the Defendant also checked her for ticks while they were in his truck. On these occasions, the victim would have her pants pulled down and her shirt pulled up. The Defendant would check her with his hands while he drove with his knee. The Defendant touched her "privates" on these occasions. Sometimes, Sister would be in the back seat while the Defendant was checking the victim for ticks.

The victim testified that she and the Defendant were also naked together on the Defendant's bed. The Defendant touched her "private" with his penis. She stated that "[i]t hurt" and that she pushed him away. The Defendant also touched her "private" with his penis while the victim was in her bedroom. On this occasion, she was in her bunkbed preparing to go to sleep. The Defendant came in, and her pajamas were "taken off." The Defendant's clothes were also off. On another occasion, she and the Defendant were in his bedroom. They were both naked. He touched her "butt" with his penis. It hurt, and she "[t]r[ied] to get away." When the Defendant was touching her with his penis, he told her, "I love you."

The victim testified that the Defendant told her that she could not tell anyone about what had happened because he "would get in trouble." He also told her that, if she told anyone, he would hurt her. When asked if he told her how he would hurt her, she answered that he told her he would kill her.

The victim testified that she continued to communicate with the Defendant by computer and phone after he left for Iraq. She talked to him less the closer it got to him returning home because "[h]e always wanted [her] to send him pictures." She did not want to send him pictures. She also was concerned about his return home because she "had told somebody about what he done." She clarified that she had told Aunt that the Defendant had touched her "in an inappropriate way."

She subsequently spoke with other people about what had happened, but she was too embarrassed to tell everything. She reviewed a drawing of a female child and testified about circling the parts of the body that the Defendant had touched on her. The drawing was admitted into evidence.

On cross-examination, the victim acknowledged that she spent a lot of time with the Defendant's mother, "Nanna Tammy." The victim continued to stay with Nanna Tammy after the Defendant was in Iraq. She testified that she never told the Defendant that she wanted to change her last name to his and that Mother got "mad" when she saw a photograph of the victim marching with the Defendant that identified the victim with the Defendant's last name. The victim also denied ever telling the Defendant or Nanna Tammy that she wanted to live with the Defendant.

The victim acknowledged sending the Defendant numerous text messages in November 2009 telling the Defendant that she loved and missed him. She acknowledged sending the Defendant a photograph of herself on April 7, 2010. On April 25, 2010, she sent the following message to the Defendant: "I don't care if your [sic] over on the other side of the world just hurry and get back." She acknowledged that Mother would not have made her visit the Defendant and that she could have refused to visit.

Sister, seven years old at the time of the trial, testified that, before the Defendant left for Iraq, she would ride in the backseat of his truck while he drove, and the victim was in the passenger seat. Sometimes, the Defendant would drive with his knee. Sometimes, Sister would see the Defendant touching the victim with his hands while he drove with his knee. One time, she saw the Defendant touching the victim's "private." Sister told him to stop, and the Defendant told her, "Shut up." The Defendant also told Sister not to tell people about what she saw, or he would "kill" her.

Investigator John Haynes with the Cumberland County Sheriff's Department investigated the case. He testified that there were two forensic interviews taken of the victim. He also testified that he read the e-mails, which he found "very disturbing." He characterized the May 28, 2010 e-mail as a "love letter."

On cross-examination, Inv. Haynes acknowledged that the victim was not taken to a medical doctor until nine months after she reported the allegations.

The State rested its case-in-chief after Inv. Haynes' testimony.

The defense called Kelly Mays, a forensic interviewer for the Eighth Judicial District, who testified that she interviewed the victim on June 22, 2010. The victim did not report that the Defendant had sexually penetrated her. The victim reported that she had seen the Defendant's penis once "when they were playing outside on a slip-and-slide, and his shorts got caught."

On cross-examination, Mays acknowledged that most children she interviewed did not disclose "everything" during their initial forensic interview.

Wes Clark testified on behalf of the defense that he was a "licensed professional counsellor" at the Fentress County Children's Center. He first saw the victim on July 2, 2010, and last saw her on April 8, 2011. The victim told him that she had experienced "a penis-vagina sexual act" "about five times." The victim described ejaculation occurring.

Jane Montgomery, a forensic interviewer, testified on behalf of the defense that she interviewed the victim on February 24, 2011. She asked the victim to describe her father's penis. The victim did so, but did not describe an erect penis. Nor did the victim describe ejaculation. The victim told her that, when penetration was attempted, "it hurt," but the victim "did not know" what the penis felt like.

Dr. Ronald Wright testified that he held both medical and law degrees. In the medical field, he specialized in pathology. He was board-certified in the anatomical, clinical, and forensic fields and was proffered by the defense as an expert "in prepubescent examinations and anatomy, plus clinical and forensic pathology." The State did not object to Dr. Wright's testifying as an expert.

Dr. Wright reviewed the victim's statements as well as her medical records. He testified that, due to the victim's age and prepubescent status at the time of the alleged sexual penetrations, "if there was full penetration of something as large as a penis into her vagina, . . . it's most [sic] likely than not that she would have had a tearing of her hymen, and most

probably, it wouldn't have healed" by the time of her medical exam. He added that the victim's report of five incidents of sexual penetration was inconsistent with her physical examination. His review of the photographs taken of the victim's hymen confirmed that it was uninjured.

On cross-examination, Dr. Wright acknowledged that the victim had given no indication about the extent of penetration in terms of inches. He also acknowledged that a genital injury could occur without rupturing the hymen and that such an injury could have healed before the physical examination.

The Defendant testified that he did not commit the crimes of which he was accused. He described his home as a three-bedroom, single-wide trailer where he lived with his mother. He and his mother were living in this home during the times in question. He described the home as not having much privacy. He also described the relationship between the victim and his mother as "like best friends."

Referring to his calendar, the Defendant testified that he had visitation with the victim on July 18, 19, 25, and 26, 2009; August 29 and 30, 2009; September 5, 6, 12, and 13, 2009; October 17 and 31, 2009; and November 1, 14, 15, 21, 22, 28, and 29, 2009. The victim also visited him at Camp Shelby, Mississippi, in February 2010, shortly before he was deployed to Iraq. While there, she marched with him in the squadron.

After the Defendant was deployed, he communicated with the victim by e-mail, text message, and phone calls. He did not communicate with Sister as frequently because of her younger age. When he came back on leave in April 2010, the victim acted very happy to see him. Shortly after he returned to Iraq about a week later, the victim ceased communicating with him.

Immediately before he stopped hearing from the victim, he was communicating with Mother. The Defendant described these communications with Mother as "not friendly." They had been arguing about the possibility of the victim taking the Defendant's last name. The Defendant also was planning on trying to get custody of the victim after he came home from Iraq. The Defendant testified that the victim wanted to move in with him. Mother's response to this possibility was "never." Mother also threatened the Defendant that he would never see the victim again. Subsequently, Mother's mother-in-law got the victim's cellphone and began texting and telling the Defendant to leave the victim alone. The Defendant had stopped hearing from the victim and became "frantic."

The Defendant spoke with his chaplain, who advised him to try communicating with the victim through something she liked. The Defendant knew that the victim liked music,

so he "tried to use some of the songs she likes to try to get – get through to her, to see what – what was wrong with her." He stated that the victim played the David Gray songs "all the time." The songs were on the David Gray CD that he had in his truck. He added, "I've been singing . . . the 'Sail Away' song to the kids since they were really young. They liked it. It's got a nice slow melody to it. It's relaxing." He rejected the State's characterization of his use of the lyrics as a "love letter" and explained that he simply was "trying to reconnect with [his] daughter."

The Defendant reiterated that he did not put his penis into any part of the victim's body and did not touch her private area with his hands. He testified, "I'd never hurt my kids."

On cross-examination, the Defendant admitted that he previously had been in arrears in his child-support payments but stated that he was currently "paid in full." He reiterated that it was the victim who wanted to change her last name. He denied that he sent the song lyrics as a love song. He admitted sending two photographs of himself with his shirt off to the victim from Iraq. He repeatedly denied having touched the victim in any inappropriate manner. He acknowledged a bad check conviction in general sessions court.

On re-direct examination, the Defendant stated that, during the period of time that he was in contact with the victim before leaving for Iraq, he spoke with her "[e]very day, several times a day." Their frequent talks continued until shortly after the argument with Mother about the victim's last name.

In rebuttal, the State called Holly Carrier, the Defendant's ex-wife. They married in June 2005 and divorced about one year later. She testified that the song "Sail Away" was a song that she and the Defendant "discovered together." They bought the CD and considered it to have "romantic significance." She testified that she and the Defendant "made love to that song several times."

During its charge to the jury, the trial court instructed the jury that the State had made the following election of offenses:

> In this case, the state has elected to submit for your consideration as to Count One of the indictment the alleged act of vaginal intercourse occurring in the defendant's bedroom on Dogwood Lane.
>
> As [to] Count Two, the state has elected to submit for your consideration the alleged act of anal intercourse occurring in the defendant's bedroom on Dogwood Lane.

As to Count Three, the state has elected to submit for your consideration, the alleged act of vaginal intercourse occurring in the alleged victim's bedroom at the defendant's residence on Dogwood Lane.

The jury subsequently found the Defendant guilty of the lesser-included offense of aggravated sexual battery on each count. After a sentencing hearing, the trial court sentenced the Defendant to nine years on each count. The sentences for counts one and two were to run consecutively, with the sentence for count three to run concurrently, for an effective term of incarceration of eighteen years, to be served at 100%. The Defendant timely filed a motion for new trial, which the trial court denied after a hearing.

In this direct appeal, the Defendant raises four issues: (1) the trial court erred in allowing the State to reference uncharged conduct during its opening statement and then to adduce testimony about the uncharged conduct during trial; (2) the evidence is not sufficient to support his convictions; (3) the trial court erred in singling out a juror for questioning after the close of proof; and (4) his sentence is excessive. We will consider each of these issues in turn.

## Analysis

*References to, and Proof of, Uncharged Conduct*

The Defendant complains that the State should not have been allowed during opening statement to refer to Sister's anticipated testimony about the Defendant touching the victim and, further, should not subsequently have been allowed to adduce this proof without a jury-out hearing. The State disagrees.

Prior to trial, the Defendant filed a "motion to exclude evidence of uncharged misconduct" which referred to "evidence of sexual misconduct with any child other than [the victim], and evidence of sexual misconduct with any child occurring outside of Cumberland County, Tennessee." The State responded by requesting the trial court "to reserve its ruling on the defendant's motion until such time as this matter is being tried," which defense counsel acknowledged "does make some sense."

During opening statement, the prosecutor told the jury the following:

Now, what [the victim] is here to tell you about today, what she told [Aunt], is that when she would be at her father's house during these times, he would check her for ticks. And what this meant to [the victim] is that she would go into her father's bedroom, that he would take her clothes off of her,

or have her take her clothes off, and that he would use his hands and his fingers to touch all over her body, including her private areas. And [the victim] will tell you that this didn't just happen while they were at his house, checking for ticks, and it just didn't happen when it was hot outside; that it happened when it was cold outside, and that it also happened when he would be driving and taking [the victim] and [Sister] back to his house. That [the victim] would be sitting in the front seat, and the defendant would tell her, "It's time to check for ticks." She would pull her pants down, pull her underwear down, and as he drove with his knees, his hands and fingers would once again be on her private parts checking her for ticks.

> *[Sister] would be in the vehicle on some of these occasions. And she's here today to testify and tell you what she saw. She's also going to tell you what the defendant told her, and how he told her not to tell anyone about this, and if she did, that he would kill her.* Unfortunately, for [the victim], checking for ticks wasn't all that the defendant would do to her when she was at his house from July to December.

(Emphasis added).

Following the State's opening statement, the defense moved for a mistrial, arguing as follows:

> We were provided a motion for a bill of particulars [sic] in this case, in which we were informed that the counts went through three, the acts all occurred in the defendant's bedroom in his residence, and that they were all acts of sexual intercourse. We previously filed a 404(b) motion asking you to keep out, you know, evidence of other acts which were not charged, other children which were not charged, and we heard repeated reference to [Sister] and being in a car while this touching was going on. Based on our prior conversations, and as I understood your ruling,[1] that the State, before they got into any of that, would be requesting a hearing out of the – a conference-out hearing of the members to address this. But they've blatantly brought it up in opening, in their opening statement, and they've rang [sic] a bell which can't be unrung. The members have, have heard this. This is more than what we were – it's a surprise. It's more than what we were prepared to defend against, and would ask that you [grant] . . . a mistrial in this case.

---

[1] It is unclear from the record to what "ruling" the defense lawyer was referring.

-11-

The State responded that the evidence to which it referred during opening statement was admissible under State v. Rickman, 876 S.W.2d 824 (Tenn. 1994). The trial court denied the Defendant's motion for a mistrial, ruling as follows:

> Well, bill of particulars narrow the event somewhat, but it does not preclude the incidents that occurred within the window of the alleged time frame. So, I don't think you're entitled to a mistrial on any sort of surprise or anything, nor a misconduct on the part of the State in mentioning these in opening statement.

Subsequently, Sister testified as set forth above. The defense did not raise an objection based on Tennessee Rule of Evidence 404(b) prior to, or during, Sister's testimony.

The Defendant contends on appeal that "Rickman did not apply in this case: even though specific dates were not charged, *specific acts* were charged, and the trial judge allowed evidence of uncharged sexual acts not amounting to sexual intercourse to be referenced/admitted without a prior jury-out hearing/over the Defendant's objection."

In Rickman, our supreme court held that, when an indictment charging sex crimes is not time specific, evidence relating to other sex crimes that allegedly occurred during the time period identified in the indictment is admissible. Id., 876 S.W.2d at 829. In this case, the indictment alleged that the Defendant committed each of the child rapes during the period July 1, 2009 to December 1, 2009. Under Rickman, the State could adduce proof of other sexual acts alleged to have occurred during this time frame.[2] Sister's testimony was limited to this time frame. Accordingly, the State properly referred to admissible evidence during its opening statement. The Defendant is entitled to no relief on this basis.

We turn now to the Defendant's complaint that the trial court did not comply with Tennessee Rule of Evidence 404(b), which provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

---

[2] We emphasize that, when the State adduces proof of other sexual acts alleged to have occurred during the time period charged in the indictment, the State must make an election of offenses "as to the particular incident for which [each] conviction is being sought." Rickman, 876 S.W.2d at 829. In this case, the State made an election of offenses.

(1) The court *upon request* must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b) (emphasis added).

The Defendant's complaint that the trial court did not hold a jury-out hearing before allowing Sister to testify is waived because the Defendant did not request such a hearing. See id.; see also State v. Jones, 15 S.W.3d 880, 895 (Tenn. Crim. App. 1999). Moreover, even if we construed the Defendant's motion for mistrial as a continuing objection to Sister's testimony such that the trial court should have conducted a jury-out hearing to determine the admissibility of Sister's testimony, and even if the trial court should have excluded Sister's testimony, we hold that any error was harmless. See State v. Rodriguez, 254 S.W.3d 361, 375 (Tenn. 2008) (applying Tennessee Rule of Appellate Procedure 36(b) harmless error review to trial court's erroneous admission of evidence).

The victim testified about the Defendant checking her for ticks, including her genital region, while they were in his truck. Therefore, Sister's testimony was largely limited in effect to corroborating the victim's testimony. Thus, the Defendant has failed to demonstrate that Sister's testimony "more probably than not affected the judgment" or "result[ed] in prejudice to the judicial process." Tenn. R. App. P. 36(b). Accordingly, he is not entitled to relief on this basis.

*Sufficiency of the Evidence*

The Defendant contends that the evidence was not sufficient to support his three convictions of aggravated sexual battery. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn.

R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

Aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim" where the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-504(a)(4) (2006). "Sexual contact" is defined as including "the intentional touching of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6). "Intimate parts includes the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2).

In this case, the State elected three specific instances of unlawful sexual contact between the victim and the Defendant: an act of vaginal intercourse in the Defendant's bedroom, an act of anal intercourse in the Defendant's bedroom, and an act of vaginal intercourse in the victim's bedroom. In support of these alleged criminal acts, the victim testified that, while she was naked in her father's bedroom, he touched her "private" with his penis. The victim also testified that, when she was in her bunkbed in her bedroom, the Defendant came in, took off her pajamas, and touched her "private" with his penis. The victim also testified that, on another occasion, she was in the Defendant's bedroom, and the Defendant touched her "butt" with his "private."

In essence, the Defendant challenges the credibility of the State's witnesses. This Court does not reassess witness credibility, however. See, e.g., Dellinger v. State, 279 S.W.3d 282, 292 (Tenn. 2009) ("It is well established that appellate courts do not reassess credibility determinations."). It is the jury's duty to determine whom to believe when

presented with conflicting accounts. In this case, the jury chose to accredit the victim's testimony, and it rejected the Defendant's testimony. The jury acted within its prerogative, and the victim's testimony was sufficient for the jury to convict the Defendant as it did. The Defendant is entitled to no relief on this basis.

*Trial Court's Questioning of Juror*

After the close of proof but before closing arguments, the State moved the trial court to excuse one of the jurors as an alternate because the juror was a first cousin of one of the defense lawyers.[3] The State explained that it had just become aware of this relationship. The defense lawyer acknowledged the relationship but denied that there was any legal basis for the juror to be excused. The jurors were not questioned during voir dire about any relationships with counsel for the parties.

The trial court then questioned the juror in chambers, with counsel and the court reporter present. The juror acknowledged her relationship to defense counsel but stated that the relationship would have no bearing on her ability to sit on the case, adding "I don't ever see him anyway." She stated that she would not favor the defense because of the relationship. She reiterated that she would decide the case on the proof and added that she was "not even thinking of" defense counsel. The trial court ruled that the juror could remain on the panel.[4]

The Defendant now argues to this Court that "this singled-out interaction between the juror, the judge and the parties may have caused [the juror] to give undue deference to the state's evidence and witnesses and chilled her from giving due consideration to Defendant's evidence and witnesses." Accordingly, the Defendant continues, his "constitutional right to trial by an impartial jury was violated."

We disagree. As this Court previously has recognized, "[t]he procedure relating to the selection of a fair and impartial jury is a matter entrusted to the sound discretion of the trial court." State v. Bowers, 77 S.W.3d 776, 783 (Tenn. Crim. App. 2001) (citing State v. Plummer, 658 S.W.2d 141, 143 (Tenn. Crim. App. 1983); Tenn. R. Crim. P. 24(a)). "A trial

---

[3] Although the State did not refer to a particular statute by number, it appears from the transcript that the State was relying upon Tennessee Code Annotated section 22-1-104, which provides that "[n]o person may act as a juror in any case in which the person is interested, or in which either of the parties is connected with the person by affinity or consanguinity, within the sixth degree, as computed by the civil law, except by consent of all parties."

[4] The record reflects that the juror later was not excused as an alternate, and she deliberated as a member of the jury.

court is granted wide discretion in ruling on the qualifications of the jurors, and a trial court's decision in this regard will not be overturned absent an abuse of discretion." Id. (citing State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989)).

The Defendant has failed to establish that the trial court abused its discretion in questioning the juror in chambers. Clearly, defense counsel was satisfied with this procedure at the time and, further, made no objection when the trial court ruled that the juror would remain on the jury panel.[5] We note that Tennessee Rule of Criminal Procedure 24(b)(2) provides that "[o]n motion of a party or its own initiative, the court may direct that any portion of the questioning of a prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors." Tenn. R. Crim. P. 24(b)(2). Although this provision is addressed specifically to prospective, rather than seated, jurors, we conclude that it provides analogous support for the trial court's conduct in this instance. Clearly, the trial court needed to respond to the State's motion. We discern no abuse of discretion in the trial court's decision to question the juror in the court's chambers, with counsel and the court reporter present. Indeed, we cannot envision any better approach than the one employed by the trial court under these circumstances.

Therefore, the Defendant is entitled to no relief on this basis.

*Sentencing*

The trial court sentenced the Defendant as a Range I offender. Aggravated sexual battery is a Class B felony. Tenn. Code Ann. § 39-13-504(b). The Range I sentencing range for a Class B felony is eight to twelve years. Id. § 40-35-112(a)(2) (2006). The trial court sentenced the Defendant to a mid-range sentence of nine years on each count. The trial court then ordered that the sentences for counts one and two run consecutively with the sentence for count three to run concurrently. In sum, the trial court sentenced the Defendant to an effective term of eighteen years of incarceration, to be served at 100%. The Defendant contends that his sentence is "too harsh."

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

---

[5] By failing to object to the trial court's ruling, the Defendant waived any issue regarding the juror's qualifications to sit on the jury. See State v. Cayle Wayne Harris, No. M2004-00049-CCA-R3-CD, 2005 WL 2255488, at *14 (Tenn. Crim. App. Aug. 23, 2005). We discern the issue raised on appeal as recast to challenge the trial court's procedure in addressing the State's motion rather than the trial court's ruling that the juror was not disqualified.

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006).

The referenced "principles of sentencing" include the following:  "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs."  Tenn. Code Ann. § 40-35-102(1), (3)(C) (Supp. 2009).  Moreover, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed."  Id. § 40-35-103(4), (5) (2006).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

    (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

-17-

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In this case, the record supports the Defendant's sentence. At the sentencing hearing, the presentence report was admitted into evidence without objection. The presentence report indicated that the Defendant had two prior misdemeanor convictions, one for passing a bad check and one for being absent without leave from the Tennessee National Guard. Mother

testified that the victim had received counseling regarding the Defendant's crimes against her for about one year. Mother testified that, after the Defendant's crimes, the victim's attitude changed, with the victim becoming "more aggressive." The victim was diagnosed with an anxiety disorder.

The Defendant's mother testified and explained that the Defendant was the "sole provider" for the family, including the Defendant's brother, his wife, and the Defendant's "two children that are at home." Since the Defendant's convictions, they had lost the family business and were in danger of losing the family home and vehicle. The Defendant made a statement of allocution, asking for a light sentence so that he could continue to help his family.

After determining that the Defendant was a Range I offender, see Tenn. Code Ann. § 40-35-105 (2006), the trial court applied as enhancement factors the Defendant's prior criminal convictions; that the victim suffered particularly great personal injuries, referring to her mental trauma; and that the Defendant abused a position of private trust. See id. § 40-35-114(1), (6), (14) (Supp. 2009). The trial court indicated that it was giving only some weight to the first two of these enhancement factors, but weighed the third factor "heavily." In mitigation, the trial court recognized the Defendant's military record, his employment record, and his "good social history, indications of providing for family, including extended family." See id. § 40-35-113(13) (2006). On the basis of these enhancement and mitigating factors, the trial court sentenced the Defendant to nine of a possible twelve years for each conviction.

The trial court then determined that partial consecutive service was appropriate, noting "[t]he nature and scope of the sexual acts and the extent of the residual physical or mental damage, the nature of the contact with the victim, the manner in which it was conducted, how it was done, [and] the residual impact on the child with the mental damage." Accordingly, the trial court ordered that the Defendant serve his sentences on counts one and two consecutively, with the sentence on count three running concurrently, for an effective term of eighteen years in the Tennessee Department of Correction, to be served at 100%. See id. § 40-35-501(i)(1), (i)(2)(H) (Supp. 2009). In ordering partial consecutive service, the trial court relied on Tennessee Code Annotated section 40-35-115(b)(5), which provides that consecutive service may be imposed when

[t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim . . . , the time span of defendant's undetected sexual activity, the nature and scope of the

sexual acts and the extent of the residual, physical and mental damage to the victim . . . [.]

Tenn. Code Ann. § 40-35-115(b)(5) (2006).

The record reflects that the trial court properly applied the purposes and principles of the Sentencing Act and properly applied enhancement and mitigating factors. The record further reflects that partial consecutive service is appropriate. We discern no abuse of discretion by the trial court in sentencing the Defendant. Therefore, the Defendant is entitled to no relief on this basis.

## Conclusion

For the reasons set forth above, we affirm the trial court's judgments.

_____
JEFFREY S. BIVINS, JUDGE